**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **ADVANCED TESTING**<br>**TECHNOLOGIES, INC.,**<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>**CDI CORPORATION and THE M&T**<br>**COMPANY,**<br><br>      **Defendants.** | )<br>)<br>)<br>)<br>)<br>)   **CIVIL ACTION NO. 5:13-CV-79 (MTT)**<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

Before the Court is Defendants CDI Corporation and CDI-M&T Company, LLC's[1]

motion for summary judgment. (Doc. 39). Plaintiff Advanced Testing Technologies, Inc.

("ATTI") brought this lawsuit because, in its view, the Defendants improperly interfered

with its business with the United States Air Force. According to the Plaintiff, Robert

Buckley, a former employee of the Plaintiff who went to work for the Defendants, told

the Air Force that it did not need to purchase new equipment from the Plaintiff because

he could fix the equipment the Plaintiff said needed to be replaced, despite knowing the

equipment could not be fixed. The Defendants have moved for summary judgment,

arguing that the record establishes Buckley misrepresented nothing, that he did what he

told the Air Force he would do, and that its actions were privileged under the fair

competition privilege. For the following reasons, the motion is **GRANTED**.

---

[1] During the relevant time period, The M&T Company was a subsidiary of CDI Corporation.
(Doc. 40 at ¶ 8). CDI-M&T Company, LLC is now the successor by merger to The M&T
Company. (Doc. 39 at 1).

# I. BACKGROUND

In the 1990s, ATTI developed a piece of test equipment known as the Phase Noise Measurement Module ("PNMM").[2]  (Doc. 40-2 at ¶ 6).  The PNMM is part of a test system known as the Benchtop Reconfigurable Automatic Test ("BRAT"), which the Air Force uses to test different pieces of airborne equipment.  (Doc. 48 at 9:10-19).  Put simply, certain parts of an airplane's radar system are removed from the plane and tested with the BRAT system.  (Doc. 48 at 11:21-12:4).  The PNMMs measure the phase noise sensitivity of approximately 27 pieces of radar equipment, or units under test ("UUTs").  (Docs. 40-2 at ¶ 6; 49 at 16:12-18:22, 20:13-3:20; 56-1 at ¶¶ 7-8).  The PNMMs verify that the UUTs are capable of meeting the specifications required by the Radar System Improvement Program ("RSIP").  (Docs. 56-1 at ¶¶ 8-9; 57-1 at 12:23-13:1).  ATTI delivered nine PNMMs to Robins Air Force Base in the 1990s.  (Docs. 48 at 11:12-20; 56 at ¶ 3).

The PNMMs had to be periodically calibrated and certified.  (Doc. 49 at 28:9-29:19).  For many years, the Air Force delivered its PNMMs to ATTI's facilities in New York for this calibration.  (Doc. 56-1 at ¶¶ 13-14).  After ATTI calibrated a PNMM, ATTI or the Air Force would affix an approved calibration certificate to the PNMM.  (Docs. 46 at 69:14-70:11; 56-1 at ¶ 14).  Sometime in 2005, ATTI developed a Phase Noise Calibrator ("PNC"), which allowed the Air Force to calibrate the PNMMs without ATTI's assistance.  (Docs. 49 at 30:11-31:5; 56-1 at ¶ 15).  The PNC emits signals in the same frequency as the RSIP specifications and tests whether the PNMM can correctly measure them.  (Doc. 49 at 30:22-32:15).  The PNC itself had to be calibrated and certified.  (Doc. 49 at 86:24-87:4).

---

[2] The Court has made every effort to keep acronyms to a bare minimum.

During the development of the PNC, ATTI became aware that the PNMMs were no longer capable of measuring certain of the required RSIP specifications. (Docs. 56-1 at ¶¶ 16, 18; 42 at 26:4-17). Specifically, ATTI became aware that the PNMMs could not measure down to the extremely low noise level of 158 ("the 158").[3] (Docs. 56-1 at ¶ 26; 48 at 36:18-20; 49 at 67:13-16). ATTI's contract with the Air Force required the PNC to be set at specifications that the PNMMs were capable of measuring. (Doc. 42 at 30:4-14). Thus, because the PNMMs could not measure the 158, the PNC was set to reduced specifications. (Doc. 42 at 30:4-20). When ATTI delivered the PNC to the Air Force in March 2007, ATTI informed the Air Force that the PNC and the PNMMs did not meet all of the RSIP specifications and presented the Air Force with a document that explained the limits of the PNC. (Docs. 42 at 30:15-20, 32:11-33:9, 130:19-131:2; 56-2 at ¶ 18).

In October 2007, ATTI provided the Air Force with a white paper detailing how the PNMMs were outdated and, in ATTI's opinion, beyond economic repair. (Doc. 59-2). The solution, according to ATTI, was for the Air Force to buy new, redesigned PNMMs. (Doc. 59-2 at 3-7). Paul Armistead, a BRAT system engineer, asked ATTI for potential options that would allow the Air Force to continue using the PNMMs without a "ground-up redesign." (Doc. 56-1 at ¶ 37). In other words, the Air Force wanted to avoid, if possible, buying redesigned PNMMs.

In December 2007, ATTI provided the Air Force with three alternative solutions. (Docs. 56-1 at ¶ 37; 59-3). One involved using a commercially available piece of equipment—the Agilent 5052B Signal Source Analyzer ("the Agilent")—to measure the 158. (Docs. 56-1 at ¶ 37; 59-3 at 6-7). However, ATTI estimated this alternative would

---

[3] The actual RSIP specification is -158 dBc at 500 KHz. (Doc. 56-1 at ¶ 26).

cost more than $15 million, in part, because it involved "the writing of millions of dollars of new software routines."  (Docs. 56 at ¶ 65; 56-1 at ¶ 37; 59-3 at 1).  Purchasing redesigned PNMMs from ATTI, on the other hand, would cost the Air Force approximately $5.4 million.  (Doc. 59-3 at 1).

In September 2008, the E-3 Program Office at Hanscom Air Force Base[4] executed a purchase order with ATTI for three redesigned PNMMs.  (Docs. 42 at 140:19-141:5; 44 at 15:24-16:4; 56 at ¶ 67).  Although ATTI had conversations with the Air Force about buying an additional seven redesigned PNMMs, there was no purchase order for the remaining seven.  (Docs. 42 at 57:21-58:17, 141:12-17; 43 at 67:21-68:15; 44 at 47:10-19).  After the execution of the Hanscom purchase order, ATTI began building the redesigned PNMMs.[5]  (Doc. 56 at ¶¶ 67-68).  At the same time, Air Force personnel at Robins Air Force Base, where the old PNMMs were actually located, were concerned about their stock of PNMMs because they were not all working and calibrated.  (Docs. 52 at 60:5-22; 56-8 at 1).  As a result, in October 2008 an Air Force technician at Robins Air Force Base developed a list of short term goals.  (Doc. 56-8 at 1).  One of the goals was to "[g]et four (4) of these [PNMMs] fully operational and calibrated within 90 working days or less, if possible, after contract award."  (Doc. 56-8

---

[4] At the time, Hanscom was the system program office for the AWACS radar system, which is also known as the E-3 system.  (Docs. 44 at 8:14-9:13; 48 at 8:10-13).  At Robins Air Force Base, the BRAT system is used to test AWACS or E-3 system equipment.  (Docs. 46 at 13:21-25; 48 at 8:9-13, 9:20-10:4).  After Hanscom initially procured equipment, the BRAT program office at Robins Air Force Base was responsible for maintaining it.  (Doc. 44 at 10:3-8, 13:18-21).  Although not directly relevant to this case, it seems there was "some tension" between Robins and Hanscom because "a lot of things were not as [Robins] would like them in the [ATTI] contract."  (Doc. 52 at 47:4-48:24).

[5] It appears that 18 months was the negotiated timeframe for the delivery of the redesigned PNMMs.  (Doc. 47 at 54:4-23).  Although the redesigned PNMMs were eventually delivered to Robins Air Force Base, they were never put into operation.  (Doc. 51 at 32:9-11).

at 1-2).  The Air Force discussed the need to "[e]xplore the means for [a] sole source contractor who can meet the short term goals" and noted that "[c]urrent contractor ATTI can no longer support the repair … .  They propose an updated version at a *high cost*." (Doc. 56-8 at 1) (emphasis added).

Robert Buckley, who began working for ATTI in 1991, was involved in the design of the PNMM and the PNC.  (Docs. 40-2 at ¶ 4; 42 at 44:4-7; 56-1 at ¶ 16).  ATTI terminated Buckley in April 2007, and he then went to work for the Defendants.[6]  (Doc. 40-2 at ¶¶ 2, 4).  According to Buckley, the Air Force approached him in late October 2008 and asked whether he could provide technical assistance.  (Doc. 40-2 at ¶ 16). Buckley responded to the Air Force's inquiry in November 2008 and detailed what was required, in his view, "to meet the objectives of restoring 4 [PNMMs] to operational condition in a maximum 90 working days."  (Docs. 56 at ¶ 78; 62-1).  Buckley was not retained by the Air Force at that time.  (Doc. 40 at ¶ 16).

In March 2010, the Air Force again approached the Defendants regarding whether Buckley could provide technical assistance.  (Docs. 40-2 at ¶ 17; 68 at 82:22-83:2).  Jackie Cleghorn, then-director of the electronics maintenance squadron at Robins Air Force Base, testified about why the Air Force approached Buckley.  (Doc. 68 at 8:8-14).  According to Cleghorn, his planning chief, Jeff McCracken, came to him and said several of the PNMMS were "down" and others were going to go out of calibration shortly.  (Doc. 68 at 16:17-17:16).  McCracken told Cleghorn that even though ATTI determined it was no longer "economically feasible" to repair the PNMMs, he still

---

[6] Buckley was hired by The M&T Company.  (Doc. 40 at ¶ 8).

wanted "to try to find somebody that can repair them."[7]   (Doc. 68 at 16:17-17:16).  At the

time, Buckley was helping Robins Air Force Base with other equipment, and McCracken

told Cleghorn that he believed Buckley could "fix" the PNMMs.  (Doc. 68 at 16:17-17:16,

19:7-20:4).  On March 5, 2010, Steve Clayton wrote in a weekly report about a

discussion he and Larry Israel[8] had with Cleghorn:

> The main topic of the discussion was the BRAT [PNMM] and the fact that
> the [Air Force] has only nine of the [PNMMs] and four are not serviceable.
> The [Air Force] was told by ATTI that they will have to buy [redesigned]
> [PNMMs] as ATTI will no longer support the older model. …  During the
> discussion, Mr. Cleghorn said he would be interested in having Bob
> Buckley come to the depot and help determine [the] status of [these]
> problems. …  The intent of the visit would be to produce a plan/quote for
> [CDI] to repair the defective modules if [Buckley] determines this is
> possible.  This could provide an excellent opportunity for [CDI] to get into a
> position to provide engineering support to the depot.

(Doc. 59-5 at 2).

Cleghorn acknowledged he did not have a "great technical understanding" of

what was wrong with the PNMMs.  (Doc. 68 at 21:11-13, 75:12-19).  In fact, he testified

that he was not familiar with the RSIP specifications until this lawsuit.  (Doc. 68 at

76:12-21).  Still, he testified about what he wanted and expected Buckley to accomplish.

He testified the PNMMs would not do "what they were supposed to do," and he wanted

the PNMMs "fixed," "calibrated," "operational," "serviceable," and "ready to go."  (Doc.

68 at 21:14-22:4, 37:5-16, 39:5-8, 75:20-25).  Cleghorn testified that "if [Buckley]

couldn't make them operational and calibrated I didn't need him" and that he would

---

[7] Bradley Martin, who also worked in the maintenance squadron at Robins Air Force Base,
testified that they tried to fix the PNMMs even though ATTI had declared them beyond
economic repair because "we felt we could come out a lot cheaper repairing versus going out
and buying all new additional equipment."  (Doc. 45 at 106:11-19).

[8] Steve Clayton worked for CDI and was a business development manager at Robins Air Force
Base.  (Doc. 57-4 at 44:3-15).  Larry Israel served as a business development consultant for
CDI.  (Doc. 57-4 at 44:16-22).

have "thrown [Buckley] out" if Buckley "knew that these units were not only not operational but could not be made to be calibrated." (Doc. 68 at 39:25-40:6). Finally, Cleghorn testified that he "wanted to be able to use [the PNMMs] in the shop"; Buckley was supposed to make the PNMMs "meet all the requirements to be able to go in and use"; and there was no "doubt in [his] mind that [Buckley] understood that his job … was to get these things so [he] could use them to test equipment coming off the airplane." (Doc. 68 at 39:5-8, 37:24-38:7, 40:20-41:1).

In late March 2010, Buckley travelled to Robins Air Force Base and met with Cleghorn. (Doc. 40-2 at ¶ 18). According to Buckley, Cleghorn asked him if he could help the Air Force technicians "repair" the PNMMs, and Buckley responded that he believed he "could probably help to get them functioning again." (Doc. 40-2 at ¶ 18). Cleghorn testified that Buckley said he could "fix" the PNMMs and that he actually "fixed" two. (Doc. 68 at 27:12-14, 83:3-12). Cleghorn testified that the two units Buckley fixed passed calibration by the PMEL.[9] (Doc. 68 at 28:15-29:20). After the visit, Cleghorn told his planning chief to "work something out" to get Buckley to "fix … the others we've got." (Doc. 68 at 20:5-11). On April 9, 2010, Steve Clayton wrote in a monthly report about Buckley's visit:

> [Buckley] visited Warner Robins to discuss E-3 problems with Mr. Jackie Cleghorn and his E-3A production staff. Bob Buckley worked with the E-3A personnel to help them resolve calibration problems with the [PNMM]. Robins has nine [PNMMs] with none calibrated. Bob was able to help them determine problems associated with two of the [PNMMs]. Mr. Cleghorn said he will find a contract vehicle to procure the services of Bob Buckley to continue repair effort for the remaining seven [PNMMs]. … [Clayton] inquired as to the status of the two [PNMMs] Bob Buckley trouble shot. [Cleghorn] said the parts had been received and the [PNMMs] were operational.

---

[9] The precision measurement equipment laboratories ("PMELs") are, in many cases, the entity responsible for calibrating a system. (Doc. 49 at 11:5-25).

(Doc. 59-7 at 2).  In April 2010, Cleghorn signed off on a budget authorization form for $36,500, which states: "We currently have 9 [PNMMs] that need to be evaluated and repaired.  These [PNMMs] are a part of the BRATS test station … .  The evaluation/repair cost is $36,500.00." (Doc. 59-4).

According to Buckley, the Air Force specifically wanted him to "help the technicians get the units working to a sufficient level to pass their self-test and to pass the calibration program that had been established in 2007 when ATTI delivered the PNC to the Air Force." (Doc. 40-2 at ¶ 19).  Buckley worked primarily with two Air Force technicians, John Findley and Adam Saunders.  (Doc. 57-3 at 161:2-6).  Findley testified that Buckley was contracted to "[a]ssist us in the repair of those [PNMMs] and give us a better understanding of how they worked and how we could better and more quickly diagnose them ourselves." (Doc. 48 at 33:16-25).  Similarly, Saunders testified that Buckley was brought in as "[a] technical advisor to help us understand the way that all the components in the [PNMM] worked together, and to kind of help us get an understanding of that and help us troubleshoot the modules." (Doc. 46 at 27:25-28:6).  Buckley, Findley, and Saunders all claim they were successful in reaching these goals.  (Doc. 40-2 at ¶ 22).  Findley testified that the units were ultimately able to pass their self-test and were all successfully calibrated.  (Doc. 48 at 39:10-16, 42:17-23).  Saunders also testified that at least some of the units were functioning by the end of the year, meaning they passed their self-test and calibration by the PNC.  (Doc. 46 at 32:6-15).  On July 14, 2010, Buckley informed the Air Force that he had repaired eight of the nine PNMMs.  (Doc. 56-19 at 2).

In August 2010, the Air Force signed off on a budget authorization form, which states:

> We currently have 1ea [PNC] … that needs a calibration program developed.  This [PNC] is used to calibrate our [PNMMs], which are part of the BRAT testers ... .  We have 9 [PNMMs] that CDI has repaired under an existing Navy contract … that require[] calibration.

(Doc. 56-21 at 1).  Buckley testified he was later retained so that he could "provide the Air Force with technical services related to calibrating the PNC."  (Doc. 40-2 at ¶ 24).  Findley testified that Buckley completed a manual calibration of the PNC.  (Doc. 48 at 44:15-23).  The Air Force also wanted Buckley to develop an automated process which would allow the PMEL to calibrate the PNC.  (Doc. 48 at 44:24-45:9).  Although Saunders and Findley testified that Buckley worked on the automated process, "the final work product was not delivered due to an interruption of Air Force funding for completion of the project."  (Docs. 40-2 at ¶ 24; 46 at 35:18-36:24; 48 at 44:24-45:20).

Significantly, Buckley advised the Air Force in 2010 that the "the PNMMs could not consistently test out to [the 158]."[10]  (Doc. 40-2 at ¶ 23).  Buckley's proposed "workaround" solution was to use the Agilent to measure the 158—the same device that ATTI proposed using—so that the Air Force could test its equipment to all of the RSIP specifications.  (Docs. 40-2 at ¶ 23; 46 at 38:20-39:24; 48 at 37:18-38:20).  Buckley testified that after he told the Air Force that the PNMMs were not going to meet the RSIP specifications in certain places, "AFMETCAL[11] approved a reduced calibration procedure with the concept that the [Agilent] was going to take measurements of the two UUTs requiring the [158]."  (Doc. 57-3 at 162:16-25).  Buckley testified that

---

[10] This is the same problem identified by ATTI in 2007.

[11] Air Force Metrology and Calibration ("AFMETCAL") is responsible for validating calibration and is the headquarters for the PMELs.  (Docs. 47 at 30:15-31:11; 49 at 11:5-8).

everyone "knew we needed the [Agilent] to meet the RSIP specs" and, specifically, that Saunders, Findley, and Paul Najdowski, an AFMETCAL systems engineer, knew "we need[ed] an [Agilent] so that we [didn't] violate the RSIPs standards on those two UUTs."  (Doc. 57-3 at 182:22-183:18).

Air Force personnel confirmed Buckley's testimony about using the Agilent to measure the 158.  Saunders testified the "long-term plan was to incorporate the [Agilent] into the process," and he never heard Buckley say the PNMMs could be made to meet all of the RSIP standards without the use of the Agilent.  (Doc. 46 at 103:16-104:1).  Findley testified that Buckley proposed using the Agilent to help the PNMMs test to all of the RSIP specifications.  (Doc. 48 at 37:22-38:20).  Findley also testified "the intent was to modify the UUT software to simply utilize the Agilent equipment instead of the [PNMM]" so that "the Agilent would be used instead of the [PNMM] on those two [UUTs]."  (Doc. 48 at 38:8-20).  Najdowski testified that Buckley was "open and clear about the fact that without the [Agilent] or some other workaround the [PNMMs] would not meet all of the specifications for the RSIP."  (Doc. 49 at 116:18-24).  Finally, James Annis, BRAT system program manager, testified that Buckley did not hide from the Air Force that the PNMMs were unable to measure the 158; Buckley was very open that it was an issue that needed to be addressed; Buckley came up with a solution for addressing it; and the Agilent was "an auxiliary piece required to complete the calibration."  (Doc. 47 at 7:7, 86:13-14, 137:9-138:7).

Understandably, ATTI still hoped to convince the Air Force to buy its redesigned PNMMs, and it did not stand idle as Buckley worked on the PNMMs.  Sometime in 2010, ATTI employees travelled to Robins Air Force Base to test one of the PNMMs

Buckley had worked on.  (Docs. 56 at ¶ 102; 42 at 163:9-17).  On October 31, 2010, ATTI provided the Air Force with a report "demonstrat[ing] the inability of the [PNMM] to satisfy the RSIP requirements."  (Docs. 59-10 at 3; 56 at ¶¶ 103-04).  The report advised the Air Force about "instability in the existing PNMM measurements" and purported to "demonstrate" the ability of ATTI's redesigned PNMMs to satisfy the RSIP specifications.  (Doc. 59-10 at 3, 6, 10).  On November 3, 2010, ATTI orally presented its findings to Air Force personnel, including Findley and Saunders.  (Doc. 56-26).  There is no evidence ATTI's critique of Buckley's work led the Air Force to change course.

Two days later, Buckley and CDI employees met with Air Force personnel, including Findley and Saunders, to discuss issues regarding the calibration of the PNC.  (Doc. 59-14).  A follow-up e-mail discussing the meeting states, "In simple terms, CDI is under contract … to accomplish the following for the radar testers and [PNC]: 1) restore [the PNMMs] to pass calibration; 2) restore PNC to meet calibration standards and develop organic calibration[12] capability for the PNC."  (Doc. 59-14 at 2).

ATTI's efforts to convince the Air Force to buy the redesigned PNMMs continued in 2011.  On June 7, 2011, Annis sent an e-mail to Saunders and other Air Force personnel, which stated:

> ATTI met with my leadership last week and is pushing for the B303C upgrade.  ATTI told my leadership that the E-3 radar is functioning at a degraded level due to the old PNMMs.  Based on previous testing conducted by ATTI earlier this year … they have determined that the present PNMM can't be calibrated to the RSIP standard … .  We need to come up with a strategy.  I would like to set up a telecom next Thursday (16 Jun) to discuss short term and long term plans.

---

[12] "Organic calibration" means that the Air Force itself could conduct the calibration.  (Docs. 45 at 102:22-103:4; 57-4 at 135:7-13).

(Doc. 56-30 at 1-2).  Three minutes later, Saunders responded, "I thought [Buckley] determined that [CDI] is able to calibrate to RSIP standards with the current effort we have going with [CDI][.]"  (Docs. 56-30 at 1; 56 at ¶ 111).  On June 13, 2011, Saunders sent an email to Buckley: "Bob, is the PNC being calibrated to RSIP standards?  Will this calibrator be able to validate the [PNMMs] to RSIP standards?"  (Doc. 59-16 at 2). That same day, Buckley responded:

> Yes, we fixed the errors in the AFMETCAL TO (which everyone agreed had an error in the additive phase noise floor) and we are calibrating the PNC to the RSIP standards.  If you look at the document I sent you, you will see the levels in the table and the graphs showing that we are properly calibrating the unit. … If you have the calibration document[13] that I sent with the test method you will see everything is tested to the RSIP specs.

(Doc. 59-16 at 1).

In his deposition, Buckley was asked whether, when he responded to Saunders, he "left out the part" about the 158 and failed to tell Saunders that the PNMMs would not work to "minus 158."  (Doc. 57-3 at 180:9-25).  Buckley testified he did "not intentionally" leave out "the part that said RSIP standards minus one of them."  (Doc. 57-3 at 180:24-181:1).  Rather, Buckley testified he "left out the part about that because [he] assumed [Saunders] realized we were using the [Agilent] to test to the 158, and everything else was the agreed – what I called our RSIP standards I should have said AFMETCAL standards."  (Doc. 57-3 at 180:24-181:5).  Buckley testified that "with the [Agilent], the system was calibrated and tested to RSIP."  (Doc. 57-3 at 181:12-16).

---

[13] ATTI claims this calibration certificate "does not test to RSIP standards."  (Doc. 56-1 at ¶ 43). Robert Spinner, an ATTI employee, claims this can be seen "on the Test Data Sheet that Buckley attached to the certification," which is "missing several values that are part of the RSIP phase noise characteristic requirements."  (Doc. 56-1 at ¶ 43).  Buckley admitted that the test data sheet he prepared, which was included along with several graphs, does not show a test at [the 158].  (Doc. 57-3 at 201:6-22).  However, Buckley testified he made the measurements at that specification, which can be seen on the graphs themselves.  (Doc. 57-3 at 201:20-202:24). ATTI does not appear to dispute that the graphs themselves reflect that measurement.

Again, Air Force personnel confirmed this testimony.  Najdowski testified that Buckley succeeded in bringing the PNMMs "to a point that they satisfied the RSIP specifications when used in conjunction with the [Agilent]."  (Doc. 49 at 118:16-21).  Saunders also testified the PNMMs "were sufficiently functional to meet all of the RSIP specifications, except for the [158] that was necessary for the two UUTs."  (Doc. 46 at 104:5-12).

On June 16, 2011, Air Force personnel, including Annis, Najdowski, Findley, and Saunders, met and discussed ATTI's claim that "the old [PNMMs] can't meet … [RSIP] standards."  (Doc. 56-32 at 2).  A June 17, 2011 e-mail reports that the "group consensus" was to "continue and complete calibration efforts on old PNMM configuration, meanwhile the [BRAT program office] will work the implementation plan for the [redesigned PNMMs]."  (Docs. 56-32 at 3).  On October 20, 2011, an Air Force engineer prepared a "decision tree" which examined the pros and cons of either retaining the PNMMs or upgrading to the redesigned PNMMs.  (Docs. 47 at 63:18-24; 50 at 7:11-16; 59-17 at 41-42).  One of the cons of retaining the PNMMs was that they

> have been proven incapable of meeting the E-3 Radar UUT noise specification of [the 158], as required by several UUTs.  This requires a procedural work around to support production UUT testing.  The work around will consist of skipping the TPS test steps where the [158] test is performed, and using a[n] [Agilent] to perform those tests.

(Doc. 59-17 at 42).  The decision tree ultimately recommends retaining the PNMMs, in part, because "[t]he existing BRAT 303c configuration, combined with the test procedure workarounds, will support the E-3 UUT requirements."  (Doc. 59-17 at 42).  Moreover, the PNMMs, "with the spares and available repair support, can be kept operational for at least another 5 to 10 years."  (Doc. 59-17 at 42).  In November 2011, the Air Force

informed ATTI that it would not have to complete the remaining services under the terms of its contract.  (Docs. 56 at ¶ 124; 56-36).

## II.  DISCUSSION

### A.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  But if the nonmoving party bears the burden of proof at trial, "the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)).  The moving party "simply may show … that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (internal quotation marks and citation omitted).

"Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324).  The non-moving party must rebut the movant's showing "by producing … relevant

and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. …  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

   **B.   Analysis**

   ATTI claims the Defendants tortiously interfered with its business relations with the Air Force.[14]  To recover, ATTI must show that the Defendants: "(1) acted improperly and without privilege; (2) acted purposely and with malice with the intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with ATTI; and (4) caused ATTI financial injury." *Janet Ricker Builder, Inc. v. Gardner*, 244 Ga. App. 753, 755, 536 S.E.2d 777, 779 (2000).  ATTI claims the Defendants acted improperly because Buckley committed fraud to obtain business with the Air Force. "The tort of fraud is defined in Georgia law as the willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury."

---

[14] In its complaint, ATTI brings claims for tortious interference with contractual relations, business relations, and potential business relations.  (Doc. 1 at 9-13).  In its response to the Defendants' motion, ATTI appears to address only its claim for recovery under the theory of tortious interference with business relations.  (Doc. 55 at 20).  "A cause of action for intentional interference with *contractual* relationships must be based on the intentional and non-privileged interference by a third party with *existing* contractual rights and relations." *Tom's Amusement Co. v. Total Vending Servs.*, 243 Ga. App. 294, 295, 533 S.E.2d 413, 416 (2000).  ATTI does not contend it had a contract with the Air Force for the purchase of redesigned PNMMs, other than the three ordered by personnel at Hanscom Air Force Base.  Regardless, ATTI's other claims fail for the same reason its claim for interference with business relations fails: the lack of any improper action by the Defendants.

*McDaniel v. Elliott*, 269 Ga. 262, 264, 497 S.E.2d 786, 788 (1998) (citing O.C.G.A. § 51-6-2(a)).  The Parties agree that the misrepresentation must be material.  (Doc. 73 at 14:11-15).  *See also Greenwald v. Odom*, 314 Ga. App. 46, 55, 723 S.E.2d 305, 315 (2012) ("An action for fraud cannot be sustained when based upon alleged misrepresentations which are immaterial[.]"); *McKesson Corp. v. Green*, 299 Ga. App. 91, 94, 683 S.E.2d 336, 339-40 (2009).

The Defendants dispute that Buckley committed fraud and argue their conduct was protected by the fair competition privilege.  The privilege applies where

> (a) the relation concerns a matter involved in the competition between the actor and the competitor; (b) the actor does not employ improper means; (c) the actor does not intend thereby to create or continue an illegal restraint of competition; and (d) the actor's purpose is at least in part to advance its interests in its competition with the other.

*Orkin Exterminating Co. v. Martin Co.*, 240 Ga. 662, 666, 242 S.E.2d 135, 138 (1978).  The privilege is lost when a competitor uses "wrongful means" such as fraud.  *American Bldgs. Co. v. Pascoe Bldg. Sys., Inc.*, 260 Ga. 346, 349, 392 S.E.2d 860, 863 (1990).  Thus, whether viewed as an element of the tortious interference claim or the fair competition privilege, the crux of ATTI's case is that Buckley committed fraud on the Air Force.

ATTI claims the Air Force wanted "fully operational" PNMMs, and according to ATTI, "[g]etting the units operational meant getting them to RSIP specification."  (Doc. 55 at 11, 14-15).  ATTI claims "Buckley understood that the [PNMMs] needed to be within RSIP specifications for them to be usable by the [Air Force]."  (Doc. 56 at ¶ 91).  However, ATTI claims Buckley knew the PNMMs "could not meet the RSIPs."  (Doc. 55 at 22).  To prove this knowledge on Buckley's part, ATTI cites only the inability of the

PNMMs to measure the 158.  ATTI points to Buckley's testimony that the PNMMs could not measure the 158; his testimony that he informed the Air Force in 2007 the PNMMs could not measure the 158; and his admission that the Agilent would not have fixed the PNMMs' inability to measure the 158.  (Docs. 56 at ¶ 119; 57-3 at 161:7-23, 162:5-9, 182:2-7, 184:13-15).  Thus, ATTI claims Buckley knew the PNMMs could not measure the 158 and yet he told the Air Force he could "fix" the PNMMs so that they could.

To prove Buckley's alleged misrepresentations to the Air Force, ATTI points to the general testimony of several Air Force personnel.  ATTI relies upon the testimony of James Annis that it was "implied" Buckley "could get [the PNMMs] to meet the standards, the spec, that was necessary" and that "everybody had the idea that – that he would be able to do this."  (Doc. 47 at 56:23-57:8, 57:23-58:16).  ATTI also relies upon the testimony of Bradley Martin, who testified that Buckley said he could "repair" the PNMMs, which he understood meant that "[t]hey should meet the RSIP specifications, whatever they were."  (Doc. 45 at 23:15-24).  Martin also testified that Buckley "told the [Air Force] that [he] could repair or do whatever [he was] going to do to the PNMMs to make them meet RSIP specs."  (Doc. 45 at 24:17-22).  Finally, ATTI relies upon the testimony of Jackie Cleghorn, who testified that he would have "thrown [Buckley] out" if Buckley "knew that these [PNMMs] were not only not operational but could not be made to be calibrated."  (Doc. 68 at 39:25-40:6).  ATTI claims Buckley made a misrepresentation by omission by not telling Cleghorn "about the problems with the [PNMMs] he had uncovered while at ATTI."  (Doc. 55 at 22).  Again, ATTI relies on Buckley's testimony regarding the PNMMs' inability to measure the 158.  (Docs. 55 at 22; 57-3 at 161:7-10, 182:6-7, 184:13-15).

The Defendants acknowledge that Buckley knew the PNMMs could not, by themselves, measure the 158.  However, they claim that this was known to the Air Force as well and that Buckley made it clear from the outset that to measure the 158 a "workaround" was needed.  Specifically, Buckley, like ATTI in 2007, proposed that the Agilent be used to measure the 158.  (Doc. 40 at ¶ 27).  In the Court's view, paragraph 27 of the Defendants' Statement of Material Undisputed Facts brought this issue into clear focus.  In paragraph 27, the Defendants claim that Buckley "advised the Air Force that the PNMMs could not consistently test out to [the 158]" and proposed using the Agilent to measure the 158, such that the PNMMs could test to all of the RSIP specifications when used alongside the Agilent.  (Doc. 40 at ¶ 27).  ATTI's response to paragraph 27 did not squarely address this assertion.[15]  Although ATTI denied paragraph 27, its explanation for its denial largely dodged the issue.  While the response cited paragraphs 65 and 100 of its Counterstatement of Relevant Undisputed Facts, those paragraphs also did not address whether Buckley proposed using the Agilent to measure the 158.  However, those paragraphs in turn referenced the affidavit of Robert Spinner, an ATTI employee.  In paragraph 38 of Spinner's affidavit, he states:

> I came to learn during the course of this case that Buckley apparently suggested the use of the [Agilent] as a *standalone* substitute to calibrate the PNC for the [Air Force].  **What he did not do is suggest the use of that device to supplement the [PNMMs] in the field.**

---

[15] ATTI's briefs skirted the issue as well.  ATTI characterized Buckley's affidavit attesting to his discussions with the Air Force about using the Agilent to measure the 158 as "self-serving," argued the Air Force "already rejected that approach," and argued that the Agilent was used to calibrate the PNC.  (Docs. 55 at 17 n.14; 56 at ¶ 27).  But ATTI never addressed the question of whether Buckley disclosed to the Air Force that the PNMMs could not measure the 158 and proposed using the Agilent.

(Doc. 56-1 at ¶ 38) (italics in original; bold emphasis added).  This concerned the Court for two reasons.  First, Spinner's affidavit suggested that he had no personal knowledge of what Buckley did or did not propose.  Second, as discussed above, numerous Air Force personnel confirmed that Buckley made clear that he proposed using the Agilent to measure the 158.  (Docs. 46 at 103:16-104:1; 47 at 86:13-14, 137:9-138:7; 48 at 37:22-38:20; 49 at 116:18-24).

Accordingly, the Court scheduled a telephone conference to get to the bottom of whether ATTI could dispute that Buckley told the Air Force about the PNMMs' limitations and his proposed workaround solution.  At this conference, ATTI acknowledged that it had no basis for denying that Buckley made this disclosure and that he proposed using the Agilent to measure the 158.  After the conference, ATTI, in a letter to the Court, "acknowledge[d] that several witnesses did generally testify that [Buckley] made a verbal suggestion … of using the [Agilent] to augment the [PNMMs]." (Doc. 71 at 1).  To soften the blow of this unavoidable concession, ATTI's letter argues that Buckley did not explain "any of the additional technical work that would need to be performed" or "the costs involved in adding the [Agilent]."  (Doc. 71 at 2).  It appears that ATTI is attempting to offer up a new Buckley misrepresentation.  Until now, ATTI has contended Buckley falsely represented he could fix the PNMMs to measure all of the RSIP specifications—a project ATTI characterizes as "unfixable."  (Doc. 55 at 6).  Now ATTI seems to argue that Buckley committed fraud on the Air Force when he failed to disclose fully some unspecified costs that might be associated with the use of the Agilent to measure the 158.  Not only is it far too late in the game to add this theory to its case, this new theory, as discussed below, flies in the face of the facts.

The Defendants responded to the Plaintiff's letter by noting that it "concedes the one central factual question that the Court sought to address in [the telephone conference]: it is undisputed that [Buckley] discussed with several representatives of the Air Force that the [Agilent] could be used as a workaround to address the problem that the [PNMMs] could not test to the [158] required by two of the [UUTs]." (Doc. 72 at 1). With respect to ATTI's allegations about the details of the Agilent, the Defendants argue "[t]he point is not whether using the Agilent device as an add-on workaround was a good or bad proposed solution. The point is that [Buckley] freely disclosed to the Air Force that the existing PNMMs, on their own, could not meet this particularly stringent aspect of the RSIP standard." (Doc. 72 at 1).

In short, the cornerstone of ATTI's case has collapsed. ATTI has based its claim almost entirely on the suggestion that Buckley told the Air Force he could fix the PNMMs without telling them that they could not measure the 158 without using the Agilent.[16] But, as it turns out, it is undisputed that Buckley was upfront with the Air Force about this. Thus, it is clear the Air Force knew all along what Buckley was proposing, and there is no evidence that the Air Force was under the impression that Buckley was repairing the PNMMs to measure the 158.

---

[16] In its letter to the Court, ATTI argues that the Agilent "was useless to repair the [PNMMs'] intermittence issues, a fact known to [Buckley] since his ATTI employment." (Doc. 71 at 5). It is not clear if ATTI now argues that Buckley committed fraud notwithstanding his proposal to use the Agilent because he knew the PNMMs had "intermittence issues," which means only that sometimes the PNMMs performed inconsistently. (Doc. 42 at 100:11-15). ATTI does not argue that the PNMMs' alleged intermittence issues necessarily precluded Buckley from fixing the PNMMs to meet all of the RSIP specifications, as ATTI does with the PNMMs' inability to measure the 158. Nor does ATTI specifically argue that Buckley misrepresented anything about the PNMMs' alleged intermittence issues to the Air Force. In fact, ATTI claims the Air Force was "fully aware of [its] views on the flaws in the PNMM": ATTI informed the Air Force in 2007 and again in 2010 after ATTI examined one of the PNMMs "fixed" by Buckley. (Docs. 42 at 100:16-22, 101:8-23; 43 at 27:22-28:11; 57-3 at 143:10-24, 171:11-172:1). Thus, there is no evidence that Buckley committed fraud by making material misrepresentations or omissions regarding the PNMMs' alleged intermittence issues.

In addition to the alleged misrepresentations regarding the 158 made by Buckley at the inception of the Defendants' relationship with the Air Force, ATTI claims Buckley made two additional misrepresentations after ATTI pointed to what it claimed were deficiencies in Buckley's work. But these alleged misrepresentations also refer to the inability of the PNMMs by themselves to measure the 158. Specifically, Saunders asked Buckley if the PNC could validate the PNMMs to RSIP specifications. (Doc. 59-16 at 1-2). This was shortly after ATTI met with the Air Force, "push[ed]" for the purchase of redesigned PNMMs, and told the Air Force that "the E-3 radar is functioning at a degraded level due to the [PNMMs]," which, according to ATTI's testing, "can't be calibrated to the RSIP standard." (Docs. 56-30 at 1-2; 59-16).

In his June 13, 2011 e-mail, Buckley responded by telling Saunders that everything is being tested to RSIP specifications and by pointing Saunders to the calibration certificate he had previously delivered to the Air Force, which according to Buckley, "show[s] that we are properly calibrating the [PNC]." (Doc. 59-16 at 1). ATTI claims these were misrepresentations. (Doc. 55 at 22). Buckley testified that when he responded to Saunders he "left out the part about [the 158] because [he] assumed [Saunders] realized we were using the other unit to test to the 158." (Doc. 57-3 at 180:24-181:5). Buckley also admitted that the test data sheet accompanying the calibration certificate does not show a test at the 158, but he testified he made the measurements at that specification, which can be seen on the graphs themselves. (Doc. 57-3 at 201:6-202:24). Thus, ATTI claims that Buckley told the Air Force the PNMMs were testing within specifications when in fact they were testing within specifications only with the use of the Agilent. But, again, it is now undisputed that the

Air Force knew Buckley had proposed using the Agilent.  Clearly, there were no misrepresentations.

Finally, and overarchingly, the Air Force was not being led blindly by Buckley. Throughout the process, ATTI acted aggressively to protect its interests by pointing out to the Air Force what it thought were deficiencies in Buckley's work.  The Air Force considered ATTI's arguments and, time and again, made a considered decision not to buy redesigned PNMMs from ATTI.  Its "decision tree" always led it to the conclusion to look for a cheaper alternative.  Air Force personnel testified that repairing the PNMMs was simply more cost effective than buying new ones.  (Docs. 45 at 106:11-19, 115:25-116:6; 46 at 96:13-97:6).  ATTI took its best shots at Buckley's work and still the Air Force decided to stay with Buckley.  In fact, two Air Force personnel testified that Buckley was ultimately successful in repairing the PNMMs to test to RSIP specifications when used alongside the Agilent.  (Docs. 49 at 118:16-21; 46 at 103:8-104:12).  In short, there is simply no evidence that the Air Force was misled by any material misrepresentations or omissions.

The Defendants have shown that there is no genuine issue of material fact as to whether they acted improperly.  Because ATTI has failed to establish this essential element of its tortious interference claims, the Court need not consider the Defendants' arguments that there is no evidence they acted with malice or induced the Air Force not to buy redesigned PNMMs from ATTI.  Moreover, the Defendants have established that they are entitled to the fair competition privilege.

**III. CONCLUSION**

The Defendants have shown that they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Therefore, the Defendants' motion for summary judgment (Doc. 39) is **GRANTED**.

**SO ORDERED**, this 31st day of March, 2015.

S/ Marc T. Treadwell
MARC T. TREADWELL
UNITED STATES DISTRICT COURT